UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 DEC 11  AM 9: 48

CLERK

BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| ESTATE OF BRIENNA ROSE ANTONIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK R. PEDERSEN, d/b/a HIGH COUNTRY TOURS, and MOUNT SNOW, LTD., | ) | |
| | ) | |
| Defendants/Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 5:11-cv-41 |
| | ) | |
| ANDREA MITCHELL, | ) | |
| | ) | |
| Third-Party Defendant, | ) | |
| | ) | |
| ANDREA MITCHELL and CHARLES MITCHELL, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK R. PEDERSEN, d/b/a HIGH COUNTRY TOURS, and MOUNT SNOW, LTD., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

**OPINION AND ORDER DENYING MOUNT SNOW'S
MOTION FOR SUMMARY JUDGMENT**
(Doc. 73)

Defendant Mount Snow, Ltd. ("Mount Snow") moves for summary judgment with
respect Count Two of the First Amended Complaint filed by Plaintiff Estate of Brienna
Rose Antonio (the "Estate") and Count Three of the Counterclaim filed by
Counterclaimants Andrea and Charles Mitchell.  (Doc. 73.)  Mount Snow asks the court

to rule as a matter of law that Mount Snow was not engaged in a joint venture with Defendant Mark R. Pedersen, d/b/a High Country Tours ("HCT"), and, therefore, the Estate's and the Mitchells' claims of negligence based on the purported joint venture must fail. The Estate and the Mitchells oppose the motion.

The Estate is represented by Michael J. Harris, Esq., David Compagnone, Esq., and Timothy C. Moynahan, Esq. HCT, which has taken no position on this motion, is represented by Richard J. Windish, Esq. Mount Snow is represented by Richard J. Windish, Esq. The Mitchells are represented by James W. Swift, Esq.

For the reasons set forth below, the court hereby DENIES Mount Snow's motion for summary judgment.

I.      **Factual and Procedural Background.**

   A.      **Undisputed Facts.**

This case arises out of a collision involving a snowmobile on February 20, 2010. HCT offered and guided the snowmobile tour, which originated at Mount Snow's ski resort. The tour set out at night, with one guide stationed at the front of the line of snowmobiles. Ms. Mitchell and Ms. Antonio rode the last snowmobile in the line. During the tour, Ms. Mitchell rounded an icy corner and the snowmobile she was operating slid off the trail and collided with a rock and a tree. Ms. Mitchell was injured, and Ms. Antonio died as a result of the collision. At issue is whether HCT and Mount Snow were engaged in a joint venture at the time of the accident.

In 2000, HCT approached Mount Snow with a proposal to initiate snowmobile tours on Mount Snow's property in order to take advantage of Mount Snow's snow-making capabilities during periods of limited natural snow. Mount Snow agreed to the proposal and Mount Snow and HCT have annually entered into a contract reflecting this agreement, including one entitled "Agreement High Country Snowmobile Tours," dated October 31, 2009 (the "Agreement"). The term of the Agreement was "Winter season 2010," which included the time between November 2009 and May 2010. The Agreement provided that the parties would meet within forty-five days following the close of the Mount Snow ski area "for the purpose of discussing the operation of this activity for

2

winter season 2011 and any modifications to the provisions of this Agreement." (Doc. 73-3 at 3.)  Both parties had a right to terminate the Agreement at any time due to material breach by the other party if the breach had not been cured within thirty days following written notice of the breach.

The Agreement describes the "Parties Relationship" as follows:

> [HCT] is the sole owner and operator of the snowmobile tours, including without limitation the name High Country Snowmobile Tours, and any trademarks or service marks associated therewith.  Mount Snow has no control or ownership interest in [HCT].  This Agreement does not constitute an agreement for a partnership or joint venture between Mount Snow and [HCT] or its sponsors.  All expenses and costs incurred by [HCT] in meeting [HCT]'s obligations under this Agreement shall be solely those of [HCT] and Mount Snow shall not be liable for their payment.  [HCT] can make no commitments with third parties that are binding upon Mount Snow without Mount Snow's written consent, and [HCT] in no way shall hold [HCT] out as having that power.

*Id.* at 2.

The Agreement required Mount Snow to engage in certain promotional activities, including: (1) during the entire winter season, providing HCT the same space in the base lodge for booking tours that was provided during the 2009 season; (2) providing HCT with topographical maps of available snowmobile terrain and permission to visit and evaluate potential touring sites; (3) referencing or mentioning HCT "on collateral printed after signing of the contract," *id.* at 3-4, including the winter lodging brochure; (4) including HCT in cross-selling efforts and featuring HCT on selected radio ads; (5) including HCT in merchandising efforts; (6) mentioning HCT on its website and providing a link on the Mount Snow website to the HCT website; and (7) providing HCT with three Mount Snow passes.  Correspondingly, HCT agreed that its press releases for the snowmobile tours would refer to Mount Snow as the site of the tours and would feature the Mount Snow logo.  HCT also agreed to provide Mount Snow with a $2,500 credit toward snowmobile tours to be used at Mount Snow's discretion.

The Agreement also contemplated the cross-selling of merchandise, providing that:

> [HCT] may purchase and provide to Mount Snow logoed items for sale in
> Mount Snow's retail outlets.  Mount Snow will sell logoed [HCT] items in
> all its retail outlets and retain [twenty percent] of the sales price.  The other
> [eighty percent] of the sales price will go to [HCT].  Mount Snow Retail
> will pay HCT monthly for retail sales.

*Id.* at 9.  Additionally, HCT was allowed to sell packages that included a half day

snowmobile tour coupled with a half day lift ticket to Mount Snow.

The Agreement further allowed HCT to use certain venues and facilities on the

Mount Snow premises.  Mount Snow provided HCT with space and resources for its

sales activities, including: (1) a booth in the base lodge to display a snowmobile and have

a desk and chair for one HCT staff person; (2) a phone line with an extension for making

local calls; and (3) an outdoor promotional booth.  Mount Snow also gave HCT space in

the lifts building for operations and space under a tent to store snowmobiles overnight.

Under the Agreement, HCT agreed to pay Mount Snow a commission equal to

twenty-five percent of all gross revenues from tours or other sales or services originating

on the Mount Snow property.[1]  If Mount Snow took a reservation for HCT over the

Internet, it retained an additional five percent commission.  Mount Snow had the right "to

audit the accounting operation of [HCT] tours at Mount Snow . . . at any time during or

within one year following the terms of this [A]greement."  *Id.* at 10.

Pursuant to the Agreement, HCT was responsible for developing reservation and

cancellation policies for the snowmobile tours and was required to provide these policies

to Mount Snow.  The Agreement required HCT to develop the release of liability form

for the snowmobile tours, and granted Mount Snow the authority to approve it.  The

Agreement required HCT to maintain specific insurance policies and to name Mount

Snow as an additional insured.  The insurance required by the Agreement was subject to

Mount Snow's approval and could not be reduced or cancelled without fifteen days prior

written notice to Mount Snow.  The Agreement gave Mount Snow, the sole right and

---

[1] The Agreement provided that "[i]n the event that any gross revenue payment is in arrears for
more tha[n] seven days Mount Snow shall have the option of terminating this agreement until
such payment is made to its satisfaction." (Doc. 73-3 at 10.)

option to cancel the tours without any cost, penalty or obligation in the event HCT failed to comply with its insurance obligations.

The Agreement also provides for indemnity, requiring HCT to:

> protect, indemnify, and save harmless Mount Snow from and against all liabilities, obligations, claims, damages, penalties, causes of actions, judgments, costs and expenses (including without limitation, reasonable attorneys fees and expenses) imposed upon or incurred by or asserted against Mount Snow arising out of the actions of [HCT,] its employees, agents, sponsors, or their employers, including but not limited to: (a) any accidents or injury to or death of persons or agreement of or damage to property, including any injury to person or property arising from the activities of [HCT] provided for in this Agreement, (b) any failure on the part of [HCT] to perform or comply with any of the terms of this Agreement, (c) any mechanic's or supplier's claim for lien in connection with or work done or materials furnished relating to the events which are the subject of this Agreement, and (d) any fines, penalties or other costs incurred as a result of [HCT's] failure to obtain or comply with any permits or authorizations required from any governmental entity. In case any action, suit, or proceeding is brought against Mount Snow by reason of any such occurrence, [HCT], upon request of Mount Snow, will at [HCT's] expense defend such action, suit, or proceeding. Notwithstanding the foregoing indemnification agreement [HCT] shall not indemnify Mount Snow for Mount Snow's negligence or the activities of its agents or employees.

*Id.* at 6.

During the term of the Agreement, Mount Snow agreed not to "engage in [s]nowmobile [t]ours with any other organization [or] compete with [HCT] directly and run [s]nowmobile [t]ours as a private venture." *Id.* at 3. The Agreement specified certain standards for HCT snowmobile guides, requiring that they be certified in CPR and First Aid and licensed snowmobile guides in the State of Vermont. Mount Snow had authority under the Agreement to require HCT to remove from Mount Snow's premises any employee that Mount Snow found "objectionable." *Id.* at 7. The Agreement also required that "[a]ll snowmobiles operating on Mount Snow property shall be equipped with an eight-foot 'whip' style shaft with a brightly colored flag at least two foot square[, and] [a]ll lead drivers shall w[ear] a brightly colored safety vest while operating a

snowmobile." *Id.* HCT was required to notify Mount Snow of any damage to property or injury or death resulting from a snowmobile tour.

The Agreement was not assignable by either party "without prior written consent of the other party, with the exception of an assignment to an entity controlled by, controlling or under common control with the assigning party." *Id.* at 10.

HCT's snowmobile tours originated on Mount Snow property, but proceeded onto Vermont Association of Snow Travelers' trails and through the Green Mountain National Forest. The Agreement required HCT to lay out on a Mount Snow topographical map the guided tour route that it would use and to submit that route for Mount Snow's approval. HCT was also required to submit notice of any changes to its normal trail route at least twelve hours in advance for approval by Mount Snow. The Agreement provided that HCT must offer snowmobile tours every day that Mount Snow was open for skiing if there was sufficient snow, and it specified HCT's hours of operation.

Mount Snow did not instruct participants in the snowmobile tours or guide the snowmobile tours. Mount Snow neither purchased nor repaired snowmobiles used on snowmobile tours, nor did it pay any expenses related to the snowmobiles or the equipment used by participants.

### B.   Disputed Facts.

The Estate and the Mitchells contend that, prior to execution of the Agreement, HCT presented Mount Snow with information regarding HCT's snowmobile tours, how HCT operated, and its guide hiring and supervision practices. They also assert that HCT explained to Mount Snow how it trained tour participants. Mount Snow does not recall such discussions.

The Estate and the Mitchells also claim that Mount Snow cordoned off a portion of its ski trails for HCT to use for its tours and that twice a day Mount Snow's maintenance crew groomed the portions of the snowmobile trails that were on the Mount Snow premises. Mount Snow responds that the trails were groomed only once a day and that only one trail was cordoned off; the trail with the most direct route to the Vermont Association of Snow Travelers' trails.

6

The Estate and the Mitchells assert that Mount Snow and HCT employees provided information to customers related to both companies and that Mount Snow employees made reservations for HCT's snowmobile tours.  Mount Snow contends it never booked a tour for HCT or collected a booking fee, and that volunteers, not its employees, manned the guest information booths that provided customer information.

Mount Snow contends that, despite the language of the Agreement, it never made reservations for HCT or sold HCT logoed merchandise.  Mount Snow also acknowledges that the Agreement allowed for the sale of combined snowmobile and partial-day lift ticket packages, but contends that no such packages were advertised or sold.

The Estate and the Mitchells assert that HCT was allowed to advertise on Mount Snow's private resort television station.  Mount Snow disputes that it operated a television station and responds that HCT was solely responsible for purchasing its own advertising with a local television station.

Notwithstanding the disputed issues of fact, Mount Snow argues that it is entitled to judgment as a matter of law in its favor because no rational juror could conclude that it was engaged in a joint venture with HCT.

## II.    Conclusions of Law and Analysis.

The court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) and is thus required to apply Vermont law to the substantive issues.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *In re Coudert Bros. LLP*, 673 F.3d 180, 187 (2d Cir. 2012).

### A.    Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In deciding the motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and deny the motion if a rational juror could decide in favor of the nonmoving party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "There is no material fact issue only when

reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment, the nonmoving party must offer more than "mere speculation and conjecture." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

### B.    Whether Mount Snow and HCT Were Engaged in a Joint Venture.

Mount Snow argues that the snowmobile tours were not provided as part of a joint venture between Mount Snow and HCT, and, therefore, it is not liable for the alleged negligent acts of HCT. The Estate and the Mitchells contend that determining whether Mount Snow and HCT were engaged in a joint venture is a fact-intensive exercise that is not appropriate for the court to determine on a motion for summary judgment.

While not specifically addressed by the Vermont Supreme Court, the majority of courts have found whether a joint venture exists is a question of fact for the jury.[2]

_____

[2] *See, e.g., In re PCH Assocs.*, 949 F.2d 585, 598 (2d Cir. 1991) ("Under Pennsylvania law, '[w]hat constitutes a joint venture is a question of law; but whether a joint venture exists is generally a question of fact.'") (citation omitted); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 854, 867 (E.D. Mich. 2010) (denying summary judgment on question of whether a joint venture existed, noting that the facts "create issues that cannot be resolved at the summary judgment stage[,]" and explaining that the agreements "which decidedly disclaim any joint relationship among the three [parties] – are not themselves dispositive on the issue[.]"); *Bowers v. Wurzburg*, 528 S.E.2d 475, 485 (W. Va. 1999) ("[T]he question of whether or not a joint venture exists is to be answered by the jury."); *Bahrs v. RMBR Wheels, Inc.*, 574 N.W.2d 524, 529 (Neb. Ct. App. 1998) ("[W]hether a joint or common enterprise exists is generally a question of fact."); *Olson v. Smithtown Med. Specialists, P.C.*, 602 N.Y.S.2d 649, 650 (N.Y. App. Div. 1993) ("The issue of whether a partnership or joint venture exists is a question of fact[.]"); *Latiolais v. BFI of Louisiana, Inc.*, 567 So.2d 1159, 1161 (La. Ct. App. 1990) ("It is well settled that while what constitutes a joint venture is a question of law, the existence or nonexistence of a joint venture is a question of fact."); *Mountain State*

Assuming the Vermont Supreme Court would adopt this same approach, the existence or
non-existence of a joint venture may be decided as a matter of law only if reasonable
minds could not differ. *See Hardingham v. United Counseling Service of Bennington
County, Inc.*, 672 A.2d 480, 483 (Vt. 1995) (where an issue is "'generally a question for
the jury,' the trial court may decide the question as a matter of law 'where the minds of
reasonable persons cannot differ.'") (quoting *Rivard v. Roy*, 196 A.2d 497, 500 (Vt.
1963)); *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991) ("Only when reasonable
minds could not differ as to the import of the evidence is summary judgment proper.").

Under Vermont law, "[a] joint venture is a special relationship of two or more
parties 'to engage in and carry out a single business venture for joint profit.'" *Winey v.
William E. Dailey, Inc.*, 636 A.2d 744, 751 (Vt. 1993) (quoting *Vt. Envtl. Bd. v.
Chickering*, 583 A.2d 607, 612 (Vt. 1990)). Here, the Agreement disclaims the existence
of a joint venture, but such a disclaimer alone, while evidence of the parties' intent, is not
dispositive.[3] *See Ringier Am., Inc. v. Land O'Lakes, Inc.*, 106 F.3d 825, 829 (8th Cir.
1997) ("[T]he contractual disclaimer is not dispositive, [but] it is strong evidence that the
parties did not intend that their cooperative undertaking create a partnership or joint
venture."); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity
Partners, LLC*, 722 F. Supp. 2d 854, 867 (E.D. Mich. 2010) (The . . . agreements – which

---

*Props., Inc. v. Robinson*, 771 P.2d 5, 6 (Colo. App. 1988) ("Whether a joint venture exists is a
question of fact."); *Dority v. Driesel*, 706 P.2d 995, 999 (Or. Ct. App. 1985) ("Those elements
necessary to constitute a joint venture are matters of law; whether a joint venture exists under the
evidence is a question of fact."); *Helfenbein v. Barae Inv. Co.*, 508 P.2d 101, 104 (Ariz. Ct. App.
1973) (concluding that whether the parties intended to form a joint venture is a question of fact);
Restatement (Second) of Torts § 491 cmt. c (1965) ("Whether these elements [of a joint venture]
exist is frequently a question for the jury, under proper direction from the court.").

[3] As the nonmoving parties point out, the intent of the parties to form a joint venture is less
important when considered from the perspective of a third party. *See* 46 Am. Jur. 2d *Joint
Ventures* § 11 (2012) ("As to third persons, the rule is that the legal and not the actual intent of
the parties controls, and the parties may be estopped in favor of third persons from denying that
they are joint venturers, even though they never intended to become such. Indeed, with regard to
third persons, a joint venture status will be imposed upon individual entities conducting their
affairs as if they were joint venturers, notwithstanding their actual intent.").

decidedly disclaim any joint relationship among the three [parties] – are not themselves dispositive on the issue."); *Campo v. 1st Nationwide Bank*, 857 F. Supp. 264, 272 (E.D.N.Y. 1994) (finding plaintiff had stated a cause of action for a joint venture even though written agreement stated "[n]othing in this Agreement shall make . . . either party hereto the . . . joint venturer of and with the other party[,]" the court explained that "plaintiff may be able to demonstrate the existence of a joint venture . . . outside of the written contracts") (citations and internal quotation marks omitted).

      For a joint venture to exist, "there must be an agreement to share in profits and losses, joint control or right to control, a joint proprietary interest in the subject matter and a community of interest in the performance of the common purpose." *Winey*, 636 A.2d at 751 (citing 2 Zolman Cavitch, *Business Organizations* § 41.05[1] (1993)). The Estate and the Mitchells rely on *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004), for the proposition that "the absence of one or more factors does not foreclose a finding of a joint venture." *Id.* at 512 (explaining that, in New Jersey, "the elements of a joint venture . . . 'include agreement, sharing profits and losses, ownership and control of the partnership's property and business, community of power, rights upon dissolution and the conduct of the parties towards third persons, among others.'") (quoting *Am. Fire & Cas. Ins. Co. v. Manzo*, 788 A.2d 925, 929 (N.J. Super. Ct. App. Div. 2002)). However, the Second Circuit in *Geneva* applied New Jersey law, and the full quotation explains that New Jersey cases had previously suggested that not all factors must be satisfied. *Id. Winey*, however, requires that *all* of the specified elements be present to find a joint venture. *See Winey*, 636 A.2d at 751 (using the term "must" before listing each of the elements of a joint venture); *see also Noble v. Boppel*, 2011 WL 830169, at *9 (D. Vt. Mar. 3, 2011) (explaining that, in order to show a joint venture, "a plaintiff *must* establish the following elements[,]" before listing the elements) (emphasis supplied).

      The Restatement (Second) of Torts further supports the conclusion that all elements of a joint venture must exist concurrently before a joint venture may be found. Although it describes the elements differently, the Restatement states:

> The elements which are essential to a joint enterprise are commonly stated
> to be four: (1) an agreement, express or implied, among the members of the
> group; (2) a common purpose to be carried out by the group; (3) a
> community of pecuniary interest in that purpose, among the members; and
> (4) an equal right to a voice in the direction of the enterprise, which gives
> an equal right of control.

Restatement (Second) of Torts § 491 cmt. c (1965). The court thus concludes that the

Estate and the Mitchells must adduce admissible evidence to support each essential

element of a joint venture to survive summary judgment. *See Celotex Corp. v. Catrett*,

477 U.S. 317, 325 (1986).

### 1. Whether Mount Snow and HCT Agreed to Share Profits and Losses.

Mount Snow asserts that it does not have an agreement with HCT to share in the

profits and losses derived from the snowmobile tours, because under the Agreement,

Mount Snow received twenty-five percent of gross revenues, not profits. It further points

out that it is not exposed to potential losses from HCT's snowmobile tours, and does not

share in HCT's expenses.

The statute governing Vermont partnerships, which in Vermont share many of the

attributes of a joint venture,[4] provides that "[t]he sharing of gross returns does not by

itself establish a partnership, even if the persons sharing them have a joint or common

right or interest in property from which the returns are derived." 11 V.S.A. § 3212(c)(2).

While not directly addressed by the Vermont Supreme Court, it is generally accepted that

sharing gross revenues alone will not suffice to create a joint venture. *See* 46 Am. Jur. 2d

*Joint Ventures* § 14 (2012) ("A participation in the profits, although an important factor

in determining whether a joint venture exists, does not of itself establish the existence of

the joint venture relationship, unless it is coupled with other essential elements[.] . . .

Thus, an agreement to distribute the proceeds of an enterprise on a percentage basis or the

sharing of gross returns does not in and of itself establish a joint venture.") (footnotes

---

[4] *Mislosky v. Wilhelm*, 286 A.2d 267, 271 (Vt. 1971) ("[A]lthough [a joint venture] differs from a true partnership undertaking, it has many of the legal incidents of a partnership.").

omitted).  However, the Vermont Supreme Court appears to have relaxed this requirement in certain circumstances.

For example, in *Munson v. Goodro*, 204 A.2d 126 (Vt. 1964), the court explained that:

> A gravel pit was opened on the [defendant] Goodro lands, east of the area where the alleged trespass was committed.  The pit was operated by the defendant Lafountain by agreement with Goodro which provided the latter should receive fifteen cents for each yard of gravel removed.  The plaintiffs contend that as the excavation progressed i[t] exceeded the limits of Goodro's land and invaded the lands held by the plaintiffs.

*Id.* at 127.  The court concluded that, "[t]he evidence supports the inference that the operation was conducted as a joint enterprise with both defendants participating in the profits."  *Id.*  Similarly, in *Lavalette v. Noyes*, 205 A.2d 413 (Vt. 1964), the Vermont Supreme Court considered the liability of a defendant asserting that he was not engaged in a joint logging operation and was therefore not liable for damages related to trespass and the cutting of trees on plaintiff's property.  The court found that the evidence presented by the plaintiffs, which included evidence that defendant was compensated from the logs cut, "[was] legally sufficient to establish the defendant's liability[.]"  *Id.* at 416.

Courts in other jurisdictions have reached differing conclusions regarding whether sharing of gross revenues satisfies the requirement that joint venturers share in profits. Some courts have found that parties who split revenues, rather than profits, satisfy the requirement.  *See Thompson v. Hiter*, 826 N.E.2d 503, 512 (Ill. App. Ct. 2005) (finding the "sharing in profit and losses" prong satisfied when law firm and attorney agreed to split the attorney fees on cases brought in by attorney and to share in losses if there was no recovery); *Kahle v. Turner*, 420 N.E.2d 127, 130 (Ohio Ct. App. 1979) (finding that a division of gross receipts, coupled with each party paying "the cost of those facilities, materials, supplies, services and personnel that were furnished by that party[,]" constituted a joint venture); *see also* 46 Am. Jur. 2d *Joint Ventures* § 47 (2012) ("[A] joint venture is created by an agreement between parties to exploit motion pictures and to

12

share in the gross revenues."). Other courts, however, have concluded that a contractual agreement providing for one party to pay the other a percentage of gross revenues does not constitute the sharing of profits. *See Jones v. St. Charles Cnty.*, 181 S.W.3d 197, 201-02 (Mo. Ct. App. 2005) (finding that county did not share in profits and losses when agreement provided that it would receive nine percent of gross receipts each month); *Bahrs v. RMBR Wheels, Inc.*, 574 N.W.2d 524, 529 (Neb. Ct. App. 1998) ("In the context of the landlord and tenant relationship, even an agreement between landlord and tenant that the landlord will receive as rent a stipulated portion of the income or net profits derived by the lessee through its business conducted on the premises does not create a joint enterprise.").

Here, in addition to sharing in gross revenues, the Agreement at least contemplated that Mount Snow and HCT would share in joint marketing, cross-selling endeavors, and joint name recognition. In light of the split of authority from other jurisdictions, and the Vermont Supreme Court's decisions in *Munson* and *Lavalette*, whether the circumstances of this case satisfy the profit-sharing element of a joint venture must be determined by a jury. See *Quimby v. Schaufus*, 2002 WL 34423176, at *2 (Vt. June 1, 2002) (denying summary judgment on a joint venture claim, the court noted that "the absence of specific evidence relating to profits and losses and record keeping" were "omissions that go more to the sufficiency of the evidence at trial"); *see also Compass Ins. Co., v. City of Littleton*, 984 P.2d 606, 620 (Colo. 1999) ("Since we find the term 'profits' to be ambiguous, we also hold that the term 'joint venture' as used in the insurance contracts here is ambiguous.").

In order to find that joint venturers shared in losses, most courts conclude that the agreement itself need not expressly provide for the sharing of losses; instead, it can be implied from the circumstances. *See, e.g., Dubuque Stone Prods. Co. v. Fred L. Gray Co.*, 356 F.2d 718, 721 (8th Cir. 1966) (finding that the sharing of losses "can be inferred from other provisions of the contract, the nature of the business, and the relation of the parties to the business transacted"). In addition, the potential losses for each joint venturer need not be the same. For example,

> where a joint venture involves the contribution of capital by one party and
> services by the other, neither party is required to reimburse the other for
> losses sustained. In the event of loss, the party contributing capital loses
> his capital and the one contributing labor loses the value of his efforts.
> Consequently, if the evidence at trial establishes that in practical effect the
> parties intended to share losses even though [one party's] losses would be
> in the form of loss of its labor and [the other party's] would be in the form
> of lost capital, the difference in the type of loss sustained would not defeat
> a finding of joint venture.

*April Enters., Inc. v. KTTV*, 195 Cal. Rptr. 421, 428 (Cal. Ct. App. 1983) (internal
citation omitted).

As the Estate and the Mitchells point out, Mount Snow contributed time, resources
and services in support of the snowmobile tours to perform its obligations under the
Agreement. It used print media and volunteer resources to promote and advertise the
snowmobile tours. It also groomed those portions of the snowmobile trails located on the
Mount Snow premises. Mount Snow provided space in the main lodge where HCT made
tour reservations, space in the lift building used for HCT operations, and space utilized
for the storage of HCT's equipment, all without requiring HCT to make separate rent
payments for those amenities. Finally, Mount Snow agreed not to offer a competing
service or contract with another company to offer such a service. Because Mount Snow
received no guaranteed payment for any of the services it provided under the Agreement,
it risked losses to the extent that its share of gross revenues did not exceed the resources
it expended to meet its obligations.

Because a rational juror could conclude that Mount Snow benefited from the
success of the snowmobile tours by sharing in gross revenues and risked losses associated
with its direct and opportunity costs if the snowmobile tours were unsuccessful, the court
cannot find as a matter of law that Mount Snow and HCT did not have an agreement for
the sharing of profits and losses.

### 2. Whether Mount Snow and HCT Exercised Joint Control or Right of Control over the Snowmobile Tours.

Mount Snow contends that, even if it shared in profits and losses associated with
the snowmobile tours, the second element of a joint venture – joint control – did not exist

because HCT exercised complete control over the snowmobile tours.  Mount Snow points out that HCT hired its own employees, set the course of the tour, guided the tours, determined the appropriate equipment for use on the tours, and set the standards for and supervised tour participants.  *See Beehner v. Cragun Corp.*, 636 N.W.2d 821, 832 (Minn. Ct. App. 2001) (finding no joint venture between resort and horseback riding operator when horseback riding operator "owned all the horses and equipment, hired the employees, and conducted the rides[,]" even though participants purchased the rides from the resort).

The Estate and the Mitchells respond that joint control is evident from the obligations imposed by Mount Snow in the Agreement.  For example, the Agreement required that HCT maintain insurance, required HCT guides be certified in CPR and First Aid and licensed as snowmobile guides in Vermont, and required safety features such as colored flags and brightly colored vests.  The Agreement also granted Mount Snow the right to require HCT to remove any employee that it found objectionable.  The Estate and the Mitchells also note that HCT was required to report injuries or damages to Mount Snow, that Mount Snow approved the snowmobile trails, and that HCT was required to be available to operate tours every day that Mount Snow was open for skiing and snowboarding.

Under Vermont law, mere participation in a project does not rise to the level of control necessary for a joint venture.  *See Winey*, 636 A.2d at 750-51 (finding no joint venture between husband and wife even though wife was present during contract negotiations with third party, worked uncompensated as a bookkeeper for the project, and paid bills and billed the third party for work and materials).  The court must instead consider the actual relationship of the parties to determine whether a party exercised control.  *See Chickering*, 583 A.2d at 612 (finding necessary control for a joint venture when one party, with no ownership interest in the corporation, kept the corporation's checkbooks, prepared deeds, and negotiated with brokers on behalf of the corporation, and "became involved in the engineering problems of the corporations, helped secure

financing, showed property to prospective purchasers, dealt with brokers at his offices, attended closings, handled mail, and prepared financial projections[.]").

Although "[t]he right of control is . . . essential[,] . . . management of the enterprise may be delegated to one or more of the joint venturers." 2-41 Matthew Bender, *Business Organizations with Tax Planning* § 41.05[1] (2012) (updated version of 2 Zolman Cavitch, *Business Organizations* (cited by *Winey*, 636 A.2d at 751)). Indeed, the majority of jurisdictions find that parties need not share control equally in a joint venture. *See House v. Mine Safety Appliances Co.*, 573 F.2d 609, 620 (9th Cir. 1978) ("[C]ontrol need not be shared equally between members of a joint venture, but can be delegated to one member of the group."), *overruled on other grounds by Warren v. U.S. Dep't of Interior Bureau of Land Mgmt.*, 724 F.2d 776 (9th Cir. 1984); *Sturm v. United Servs. Auto Ass'n*, 2012 WL 2135356, at *4 (N.D. Cal. June 12, 2012) (explaining that, while members of a joint venture must have joint control, they may delegate that control to one or more venturers); *Halloran v. Ohlmeyer Comms. Co.*, 618 F. Supp. 1214, 1219 (S.D.N.Y. 1985) (holding "parties to a joint venture may choose to divide the responsibilities between themselves and defer . . . to each other's different areas of expertise."); *Payton v. Abbott Labs*, 512 F. Supp. 1031, 1036 (D. Mass. 1981) ("All that is required is that every party have some degree of input into the operation of the venture.").

Here, Mount Snow imposed specific conditions on HCT's operation of its tours, influencing the route, safety aspects, and timing of the tours.[5] Furthermore, the nonmoving parties contend that Mount Snow engaged in joint marketing and cross selling, pointing out that the Agreement contemplates that Mount Snow may make reservations for HCT and receive an additional commission for this service. Mount Snow

---

[5] Mount Snow asserts that the control it exercised was designed to protect and ensure the safety of its skiers and other visitors to its premises, not for the benefit of HCT or its snowmobile operations. However, the credibility of this assertion is a question of fact for a jury to decide. *See Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

denies that this reservation system ever existed, but this creates a disputed fact for the jury to decide. *See Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) ("We do not resolve disputed issues of fact but determine whether genuine issues of fact exist to be resolved at trial.").

Mount Snow relies on *Daniels v. Corrigan*, 886 N.E.2d 1193 (Ill. App. Ct. 2008) and *Rifenburg Const., Inc. v. Brier Creek Assocs. Ltd. P'ship*, 586 S.E.2d 812 (N.C. Ct. App. 2003), *aff'd*, 593 S.E.2d 585 (N.C. 2004), for the proposition that imposing contractual requirements and restrictions does not constitute joint control. *See Daniels*, 886 N.E.2d at 1205-06, 1208; *Rifenburg*, 856 S.E.2d at 817. Mount Snow also points out that cross marketing alone is not sufficient to finding a joint venture. *See Powell v. Trans Global Tours, Inc.*, 594 N.W.2d 252, 256 (Minn. Ct. App. 1999) (finding no joint venture between hotel and tour operator when tour operated listed the hotel in its brochure, made reservations at the hotel, and staffed a desk at the hotel); *Matter of Dayton Circuit Courts No. 2*, 80 B.R. 434, 437 (Bankr. S.D. Ohio 1987) (finding no joint venture even though "parties may have been carrying out various marketing, advertising or promotional ideas in an attempt to reduce expenses and thereby increase profit"). While restricting the actions of another and engaging in joint marketing do not individually rise to the level of joint control, each are facts that a jury may consider in determining whether Mount Snow and HCT exercised joint control over the snowmobile tours. Moreover, Mount Snow did more than impose contractual obligations on HCT and engage in joint marketing. It also contracted for the rights to make reservations for the snowmobile tours, approve trail locations and hours of operations, influence employment decisions, and receive information regarding damages and injuries.

Viewing the facts in the light most favorable to the Estate and the Mitchells, a rational juror could conclude that Mount Snow exercised at least some measure of joint control over HCT's snowmobile tours.

### 3. Whether Mount Snow had a Proprietary Interest in the Snowmobile Tours.

The third element of a joint venture is a joint proprietary interest in the subject matter of the alleged joint venture. *See Winey*, 636 A.2d at 751. Mount Snow asserts that it had no proprietary interest in the snowmobile tours because HCT owned and maintained all of the snowmobiles and equipment used for the tours. The Estate and the Mitchells respond that Mount Snow had a proprietary interest because it owned and maintained the buildings where the snowmobile tour operations took place and portions of the trails that the snowmobile tours followed.

There is limited guidance from the Vermont courts regarding what constitutes a proprietary interest in the subject matter of a joint venture. However, the Vermont Supreme Court has found that "the existence of a joint venture theory cannot be said to founder as a matter of law because defendant did not have an ownership interest in every constituent corporation [that participated in the project.]" *Chickering*, 583 A.2d at 613. Moreover, courts in other jurisdictions have concluded that the parties' "contribution . . . need not be equal or of the same character, but there must be some contribution by each joint adventurer of something promotive of the enterprise." *Rhodes v. Sunshine Min. Co.*, 742 P.2d 417, 421 (Idaho 1987); *see also A.B. Hirschfeld Press, Inc. v. Weston Group, Inc.*, 824 P.2d 44, 46 (Colo. App. 1991) ("[T]here is no requirement that title to all property interests be conveyed to the joint venture."). A joint interest in property can exist so long as "the parties agree to commit their property, money, credit, labor, and skills to the venture." *A.B. Hirschfeld Press*, 824 P.2d at 46.

In this case, although HCT held an exclusive ownership interest in the snowmobiles and equipment used to operate the tours, Mount Snow had the exclusive ownership interest in the buildings, trails, and other areas of the Mount Snow premises utilized by HCT.[6] Mount Snow also contributed labor to maintain the trails and had the

---

[6] Mount Snow argues that this is evidence that the relationship of HCT and Mount Snow was more akin to that of a lessor and a lessee. *See S & W Air Vac Sys., Inc. v. Dep't of Revenue, State of Fla.*, 697 So.2d 1313, 1315 (Fla. Dist. Ct. App. 1997) (finding no joint proprietary interest where one party owned the machines and the other party owned the land on which the

ability to cross market the snowmobile tours. Although the parties did not jointly own the property used for the snowmobile tours, both parties contributed property and labor necessary to operate and promote the tours. A reasonable juror could thus find that each of Mount Snow and HCT had a proprietary interest in the snowmobile tours.

### 4.   Whether HCT and Mount Snow had a Community of Interest in the Performance of the Snowmobile Tours.

Finally, the Estate and the Mitchells assert that Mount Snow and HCT shared a community of interest in the success and profitability of the snowmobile tours, satisfying the final element of a joint venture. *See Winey*, 636 A.2d at 751. They reject Mount Snow's contention that its interests were limited only to the timely payments of its percentage of gross revenues, not generally to the success of the snowmobile tours.

The Vermont Supreme Court has not analyzed what is required to satisfy the community of interest element of a joint venture. *See Brown v. Brown*, No. 389-12-03 Bncv (Vt. Super. Ct. Dec. 2005) (Wesley, J.) ("Vermont jurisprudence provides sparse guidance as to the elements of a joint venture[.]"). In the context of joint ventures, the seminal case of *Carboneau v. Peterson*, 95 P.2d 1043 (Wash. 1939), has frequently been cited for its explanation that a community of interest "means an interest common to both parties, that is, a mixture or identity of interest in a venture in which each and all are reciprocally concerned and from which each and all derive a material benefit and sustain a mutual responsibility." *Id.* at 1055 (cited by 48A C.J.S. *Joint Ventures* § 11 (2012), 12 Am. Jur. Proof of Facts 2d 295 § 2 (1977); Restatement (Second) of Torts § 491 reporter's notes (1965)).

---

machines were located). However, Mount Snow's authority under the Agreement, particularly its rights to "require [HCT] to remove from the Mount Snow premises any of its employees or the employees of its sponsors that Mount Snow deems objectionable" (Doc. 73-3 at 6-7), to approve trails, and to require certain safety features, extend beyond that typical in a lease. As a result, evaluation of the nature of the relationship between Mount Snow and HCT is the responsibility of the fact-finder. *See Liberty Lobby, Inc.*, 477 U.S. at 250 (explaining that the inquiry on summary judgment is "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party").

In this case, Mount Snow and HCT had a shared interest in increased revenues from the snowmobile tours.[7]  Mount Snow also incurred expenses in the performance of its obligations, including providing building and trail space to HCT, overseeing the trail locations, and engaging in joint marketing.  Mount Snow benefited directly from being mentioned in HCT marketing materials, and was prohibited from engaging in its own snowmobile tours or in entering into an agreement with a different company providing snowmobile tours.  The Agreement permitted Mount Snow to contract directly with tour participants, and, in fact, Mount Snow received an increased commission if it did so.  *See Hiter*, 826 N.E.2d at 511, (finding a community of interest with respect to client for whom law firm and attorney were both named on contingent fee contract).  Examining this evidence in the light most favorable to the nonmoving parties, and considering the disputed facts that could further support the finding of a community of interest, the court concludes that whether in fact such interest exists is a question of fact for the jury.

## CONCLUSION

For the reasons stated above, the court DENIES Mount Snow's motion for summary judgment.  (Doc. 73.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this ___11th___ day of December, 2012.

Christina Reiss, Chief Judge
United States District Court

---

[7]  Mount Snow notes that "splitting of fees alone is not substantial evidence of a community of interest."  *Flowers v. Pope*, 937 So.2d 61, 68 (Ala. 2006).  The court finds *Flowers* inapposite because a rational juror could find, based on the Agreement, that Mount Snow and HCT had other shared interests related to the snowmobile tour operation beyond the sharing of revenues.